Herbert *v.* Herbert.

HENRY L. HERBERT

*v.*

JOHN W. HERBERT.

1. A defendant in a judgment at law, who has a defence which he might: have made successfully at law had he had an opportunity to set it up, but who·· was prevented from doing so by accident, unmixed with negligence or fraud on his part, may still have the benefit of his defence by suit in equity.

2. Accident is an unforeseen and unexpected event, occurring external to the party affected by it, and of which his own agency is not the proximate cause, whereby, contrary to his own intention and wish, he loses some legal right, or becomes subjected to some legal liability, and another person acquires a corresponding legal right which it would be a violation of good conscience for the latter person, under the circumstances, to retain.

3. Where a plaintiff in attachment recovers a judgment against the defendant, by concealing the invalidity of the claim on which his attachment is, founded, a court of equity will, in case relief cannot be had at law, interpose to protect the defendant against the judgment.

4. No one but a creditor of a non-resident or absconding debtor has a right to sue out an attachment, and it is essential to the exercise of his right that the plaintiff shall have a valid cause of action against the defendant.

5. Where the conduct of a plaintiff in attachment clearly shows that his object in suing by attachment was to obtain a judgment on a disputed claim, without the defendant having an opportunity of being heard in his defence, and it is also clearly shown that the judgment is not supported by a valid cause of action, the defendant will be entitled to relief in equity against the judgment.

6. An auditor in attachment should not make a report in favor of a claim· which will not support an action at law. His functions are precisely like· those of a jury, and he must decide every question submitted to him according to law and the evidence.

On final hearing on bill and answer and proofs taken orally.

*Mr. Frank P. McDermott* and *Mr. Theodore Runyon,* for complainant.

*Mr. William H. Vredenburgh* and *Mr. Joseph D. Bedle,* for defendant.

VAN FLEET, V. C.

The principal question of equity jurisprudence involved in this case has already been decided. The chancellor decided it when he denied the defendant's motion to dismiss the complainant's bill. *Herbert* v. *Herbert, 2 Dick. Ch. Rep. 11.*

The main object of the suit is to procure a decree compelling the defendant to convey to the complainant a house and lot, which the complainant says the defendant procured to be conveyed to himself, by means of a judgment in attachment, which was without any legal foundation whatever. The charge is that the judgment, by means of which the defendant acquired title to the house and lot, was not supported by a debt or other claim for which the defendant could have maintained an action had the complainant been afforded an opportunity of making defence; in other words, that the complainant owed the defendant nothing, either when he sued out his attachment or when the judgment under it was entered. There are two facts, possessing great force, bearing directly on the question to be decided, which are entirely free from dispute. They are, *first*, that the defendant's judgment was founded on an extremely stale claim, his right of action on it having accrued more than eighteen years before he sued out his attachment; and, *second*, that, although the complainant disputed the validity of the defendant's claim, and meant to defend any action which might be brought to enforce it, and so repeatedly notified the defendant, yet that it so happened that the complainant never knew that the defendant had procured his property to be seized until after judgment, under the attachment, had been entered, and his property had been sold away from him. and conveyed to the defendant. He was thus, in consequence of his ignorance that a suit had been brought against him, deprived of all opportunity to go before the court, out of which the attachment issued, and show that the claim on which the attachment was founded was invalid. The gravamen of the complainant's case is that he has been condemned unheard, or, stated in another form, the wrong of which he complains is this: that his property has been taken away from him and made over to the defendant by means of a judgment, founded on a false

claim, without his having had an opportunity of being heard in his defence. In the language of the chancellor, in this very case, " it would be monstrous if equity could not give relief in such a case."

There can be no doubt, however, about the power of this court to give relief against a judgment at law in a proper case. After an exhaustive examination of the cases on this subject in this state, the chancellor, in deciding the defendant's motion to dis-' miss the complainant's bill, defined the power of this court in such cases in this wise: " Relief will be granted where it appears that the complainant, pending the suit at law, was igno-rant of the facts upon which he relies for relief, or where, being a matter of equitable cognizance, the defence would not be received in the suit at law, or where the complainant was pre-vented from availing himself of the defence by fraud or accident, or the act of the opposite party, unmixed with negligence or fraud on his part." *Herbert* v. *Herbert, 2 Dick. Ch. Rep. 11, 15.* And Chancellor Williamson, in speaking on the same sub-ject, in a case where relief was sought against a judgment in attachment, said : " In a case like the present of foreign attach-ment, where the proceeding is *in rem,* and the judgment is obtained without the knowledge of the defendant, and all the proceedings are necessarily *ex parte,* it would be hard, indeed, if this court could not interpose to protect a party against the fraud of the plaintiff. The propriety of this court's interfering in such cases is too obvious to require its being vindicated. But even in a case where a judgment has been obtained in the absence of a party, and upon a hearing entirely *ex parte,* this court will not try the merits of a case over again, where those merits have been properly submitted to the tribunal established by law to hear and adjudicate upon them. In the case of foreign attach-ments, auditors are appointed before whom the claims are proved. There is no appeal from their decision. If the plaintiff imposes a fictitious claim upon the auditors, or a claim which has been satisfied, and for which the defendant has a receipt—in fine, if he conceals from the auditors any fact which tends to show that his claim is not a valid one, he commits a fraud upon the absent

·party, against the consequences of which this court will protect him." *Tomkins* v. *Tomkins, 3 Stock. 512, 515*. These two ·quotations state what I understand to be the established principles on which courts of equity act in giving relief against judgments at law.

Two of the principles laid down in these adjudications are, in my judgment, so exactly pertinent to the case under consideration as to make it plain that they must control its decision. The first is, that a defendant in a judgment at law, who has a defence which he might have made successfully at law had he had an ·opportunity to set it up, but who was prevented from doing so 'by accident, or by the fraud of his adversary, unmixed with negligence or fraud on his part, may still have the benefit of his ·defence by suit, in equity. And the second is, that where a plaintiff in attachment recovers a judgment against the defendant on a false claim, or by concealing from the auditor any fact which tends to show that the claim, on which his attachment is founded, is not a valid one, a court of equity will, in case no relief can be had at law, interpose to protect the defendant against the judgment, provided he shows that the judgment was ·entered without his having such knowledge of the suit as afforded him an opportunity to make his defence. These principles rest ·on the most obvious considerations of justice. It is a rule of justice, constituting part of the jurisprudence of every enlight-·ened nation, that no person shall be deprived of his rights, either ·of person or property, by judicial sentence, without an opportunity of being heard in his defence. And it is equally certain ·that no code of laws, framed to promote justice, will permit one man to acquire an unimpeachable title to the property of another, ·by means of a judgment which is unsupported by a valid cause ·of action, and which the person, whose property has been taken from him by means of it, has never had an opportunity to contest or defend. Chief-Justice Ewing, in *City Bank* v. *Merritt, 1 Green 131, 134*, declared the great purpose of the attachment ·act to be to give a creditor the right, when from non-residence ·or flight his debtor is beyond the reach of the ordinary process ·of our judicial tribunals, to seize his debtor's· property by a

process in the nature of an execution, and thus compel his debtor to appear and answer his demand. The great object intended to be accomplished by the legislature, in giving a creditor of a non-resident debtor the right to seize his debtor's property, by legal process, in advance of a judicial determination that any debt in fact exists, was to compel the debtor to come forth and pay the debt of his creditor, and, in case he failed to do so, to provide means by which his property, so seized, might be applied to the payment of his debts. But it was not the intention of the legislature that the property of a non-resident should be taken from him whether the person procuring his property to be seized was in fact his creditor or not, nor to deprive him of all opportunity of being heard in his defence. On the contrary, several provisions of the statute make it conspicuously clear that it was the intention of the legislature that a non-resident should have notice of a suit commenced against him by attachment, and also to preserve to him, in all its integrity, his right to defend such suit. The right to sue by process of attachment is given to creditors alone. No one but a creditor of a non-resident or an absconding debtor can exercise it. And he must be a creditor possessing so perfect a right of action against the defendant in attachment that, if he brought the defendant into court by the ordinary process of summons, he could maintain his action and recover a judgment against him. The statute was passed for the relief of creditors against absconding and absent debtors, and it is only creditors of that kind that are entitled to the benefit of it. It was passed to help persons having valid debts against absent and absconding debtors to enforce the payment of their debts, and it can be used by no other persons and for no other purpose. The essential qualification of a suitor under it is, that he has a right of action, as a creditor, against an absconding or absent debtor, in virtue of which he may maintain an action at law and recover a judgment against such debtor. He must be a creditor with a valid cause of action.

This brings us to the vital question of the case, which is: Did the defendant, when he sued out his attachment, have a cause of action against the complainant, possessing sufficient legal

Herbert *v.* Herbert.

efficacy to entitle him, on a full disclosure of all the facts affect-
ing the validity of his claim, to maintain an action at law and
recover a judgment against the complainant? The debt on which
the defendant's judgment is founded arose in this way: In 1868
he endorsed four notes drawn by the complainant and the com-
plainant's father and mother. Together they amounted to $1,600.
Two were for $150 each, one for $300 and the other for $1,000.
They were discounted at bank, but not paid at maturity. The
last of the four became due on the 26th day of August, 1868..
As they matured the defendant's liability as endorser was fixed
by demand of payment and notice of non-payment. He paid
the bank the amount of the largest note on the 7th day of. Janu-
ary, 1869, and the other three on the 14th day of June, 1870, so
that his right of action against the complainant, flowing from
his first payment, accrued on the 7th day of January, 1869, and
from his second payment, on the 14th day of June, 1870. From
the time the notes were made the complainant and defendant never
met, nor had any intercourse, so far as appears, until early in
1888. When the notes were made, and also when the defendant
paid them, the complainant was a resident of this state, and I
think the evidence shows that he continued, from 1870 to the
fall of 1878, to have such a residence in this state that a valid
service of process could, at any time during the intervening
period, have been made on him at his residence here. He was a
single man until the fall of 1878. He then married, and shortly
after his marriage went to live in the family of his father-in-law,.
in the city of New York. At the time of his marriage he was
engaged in business in the city of New York, and had been so
engaged continuously from February, 1871. From the time of
his marriage, up to and including the year 1888, the proofs show
that he always spent his summers in New Jersey, usually at Long
Branch. In February, 1881, he bought a lot at Long Branch,
for which he paid $1,500, and the same year he built a cottage
on it, for a summer residence, at a cost of about $2,500. This
property is the subject of this suit. From 1882, up to and in-
cluding 1888, he occupied this property every year, with two or
three exceptions, from about May 1st to about November 1st..

He was there in 1888 from some time in July until September 17th. In the spring of 1886 he rented a house at Orange, New Jersey, and remained there until some time in January or February, 1887. The directory of the city of New York for 1887–8 stated that his place of business was in New York and his house at Orange. The first letter written by the defendant's attorney to the complainant, respecting the claim in question, bears date January 7th, 1888, and requested the complainant to call at the attorney's office, in Jersey City, on his way from Orange to New York. The attorney says that he found out that the complainant lived at Orange by consulting the New York directory. The complainant voted but once between 1868 and 1888, and then in the city of New York, in 1884 or 1885. Without attempting to give a further synopsis of the evidence on this point, I state, as the result of my consideration of it, that it proves two facts—*first*, that the complainant was a resident of this state continuously from 1868 up until the fall of 1878; and, *second*, that after 1878, up to and including 1888, he resided in this state every year from three to six months. During the period last named he had, as was said by Chancellor Runyon in pronouncing the opinion of the court of errors and appeals in *Stout* v. *Leonard, 8 Vr. 492, 494,* "two places of residence, one for the summer and the other for the winter." And while so resident here, even though his residence was only temporary in its character, he was constantly in a position where he could be reached by the ordinary process of our judicial tribunals.

In my judgment, the proofs show that the defendant had no valid cause of action against the complainant when he sued out his attachment. His right of action had long been barred by the lapse of time. When his attachment issued he knew that the complainant meant to avail himself of this defence. He had had two or three interviews with the complainant in the spring of 1888, and, in giving his evidence he says that the complainant always said that his claim was outlawed—"he never claimed any willingness to pay the debt"—and he also testified, to use his own words: "I said to him once that I supposed my claim was outlawed, but I did not suppose that he would be the

man that wanted to cheat me out of it." He afterwards said, on further examination by his own counsel, that in thus testifying he must have made a mistake, for he had no recollection of ever saying to the complainant that he supposed his claim was outlawed. But he did so testify, and that, too, in answer to a question which required him to state his recollection. It is hard to believe that he would have deliberately stated, in answer to such a question, that he remembered saying something which he did not remember at all. The defendant has a son who is a member of the bar of this state. He acted as the attorney of his father in the attachment suit. The son had an interview with the complainant, in New York, on the 17th day of September, 1888. This was about five days before the attachment was issued—it is tested September 22d, and was executed on the 25th. In that interview, the son testifies, the complainant told him that he was moving up that day from his place at Long Branch, and also that he was satisfied that his father's claim had been paid and that he would not pay it. He says that he then asked the complainant whether he would agree, if his father brought suit against him in New York, to waive the defence of the statute of limitations, and that the complainant replied he would not. He then asked the complainant if he was willing to pay anything on the notes, and that the complainant said he was not. He says he then said to the complainant that, if that was his position, they would make him pay the notes if they could, and that they would commence suit against him at once.

It is thus established by evidence, put in on the part of the defendant, that the defendant knew, when he sued out his attachment, that the complainant disputed the validity of his claim, and also that he meant to resist any attempt which might be made to enforce it. The defendant and his son both say that they did not know that the complainant owned any real estate in this state until after the 17th day of September, 1888. The son says the complainant's remark to him on that day, that he was moving up from his place at Long Branch, led him to suppose that such might be the fact, and that the next day he went to Freehold and found, by an examination of the records there, that

the complainant held the title to the house and lot in question. The attachment was then issued.    The seizure under it was made, as already stated, September 25th.    At the time of the seizure the property was vacant, and the cottage and barn closed and locked. Judgment final, under the attachment, was entered April 15th, 1889 ; the property was sold by the auditor to the defendant November 16th, 1889, and a conveyance made in execution of the sale on the 18th day of December following.    The complainant had no actual notice of the attachment, or of any of the proceedings taken under it.    The defendant made no effort to give him actual notice, though he knew where the complainant was and what his address was.    The complainant had no information whatever that his property had been seized and sold until more than four months after it had been conveyed to the defendant, and then, in April, 1890, the defendant wrote to him at " 71 Broadway, New York " (his proper address), notifying him that he had become the owner of his property at Long Branch by purchase under a suit in attachment, and requesting him to remove, before the 1st of May following, any goods which he might have on the property.    So perfect was the complainant's ignorance of the fact that his property had been seized by attachment that in May 1889, after the entry of judgment final against him in the preceding April, he sold and conveyed his property to a *bona fide* purchaser for $7,250, believing that he had good right and full power to do so.

The facts just stated give to the course of conduct, which the defendant pursued in prosecuting his claim, an appearance of stealth, which goes far to justify the conviction that he knew that he could not succeed in recovering a judgment against the complainant, if the complainant was afforded an opportunity to make defence.    The antiquity of his claim made it appear to be worthless ; its staleness invited defence ; the defendant knew that the complainant meant to contest it ; why, then, after he had procured the complainant's property to be seized, and he had thus acquired a lien for whatever he might recover, did he not give the complainant actual notice of his suit, so that the question, whether he had a valid claim or not, might be finally

settled before the complainant's property was sold? It is true that the law does not, in so many words, make it the duty of a plaintiff in attachment to give the defendant actual notice of his suit, but can there be the least doubt, in view of the facts of this case, that the defendant would have given the complainant such notice had he believed that the validity of his claim could not be successfully disputed, and all he wanted had been to get what was legally due to him? The course he pursued, makes it plain beyond question, that he meant, if he could, to obtain a judgment against complainant on a disputed claim, which, on its face, appeared to be worthless, without affording him an opportunity to be heard in his defence. There has been nothing, therefore, in the defendant's conduct in this transaction which, in justice and fairness, entitles him to retain what he has acquired by means of his judgment, if it be true, as the complainant alleges, that he had a good defence against the demand on which the defendant's judgment is founded. The law abhors stealth; all its methods are fair, open and public; it means that its sentence shall be pronounced against no man until he has had a fair opportunity to be heard in his defence.

The facts above stated also make it plain, as I think, that the complainant has a right to be relieved against the defendant's judgment, and to have everything restored to him which has been taken from him by means of it, on the ground that he had a defence against the demand on which the judgment is founded, which he could have made successfully at law if he had had an opportunity to set it up, but which he was prevented from making, before the court which pronounced the judgment, because he did not know that he had been sued until long after judgment had been entered against him and the judgment executed by a sale and conveyance of his property. It is undeniable that he has, without fault on his part, been condemned unheard, and that his property has been sold away from him in execution of such sentence of condemnation; and that this has been done at the instance of a suitor who knew that his claim, on which the sentence was founded, was, to say the best of it, stale and doubtful, that it was disputed and that the complainant meant to resist its

Herbert *v.* Herbert.

enforcement by all the means at his command. So that if it should be conceded that there had been no such artifice or trick on the part of the defendant, in procuring the judgment in question to be entered, as entitled the complainant to relief in equity against it, still I think there can be no doubt that he is entitled to such relief on the ground that he had a good defence at law against the demand on which the judgment is founded, which he was prevented from making in the suit at law by accident, unmixed with negligence or fraud on his part. No charge of either negligence or fraud is made against the complainant. In all his intercourse with the defendant he appears to have acted with openness and frankness. Though notice of the issuing of the attachment was published in a newspaper, as required by the statute, it did not come to the knowledge of the complainant. Whether his failure to see it was the result of accident, or the publication was made at such a point and under such circumstances that nothing short of an accident could have brought it to his knowledge, is a matter of no importance. The essential thing is, that the complainant had a defence to the defendant's suit, which he wanted to make, and which he would have made, with success, if he had an opportunity to do so, but he was deprived of such opportunity by the defendant's adopting a course of proceeding against him which was wholly unexpected and unforeseen. The suit which the defendant's attorney threatened to bring against him, in the interview of September 17th, 1888, he had a right to believe, from what was then said, was to be brought in the courts of New York. His attention was expressly directed to New York as the place where the litigation was to occur. So that it would seem to be entirely clear that he lost his opportunity to make defence in the suit at law by the occurrence of an event that he neither expected nor apprehended. No definition of accident, as a word of legal science, has, as yet, been constructed which is sufficiently comprehensive to embrace all events of that kind. The one framed by Professor Pomeroy is the best that I have seen. It fits this case exactly. He says:

Herbert v. Herbert.

"Accident is an unforeseen and unexpected event, occurring external to the party affected by it, and of which his own agency is not the proximate cause, whereby, contrary to his own intention and wish, he loses some legal right, or becomes subjected to some legal liability, and another person acquires a corresponding legal right, which it would be a violation of good conscience for the latter person, under the circumstances, to retain." *Pom. Eq. Jur. § 823.*

In my judgment, the complainant is entitled to relief on the ground that his defence at law has been irretrievably lost by accident without his fault.

There is another ground on which I think the complainant is also entitled to relief. The gentleman appointed auditor in the defendant's attachment suit is a lawyer distinguished for learning, sagacity and integrity. The law made it his duty to ascertain the sum due to the defendant from the complainant. *Rev. p. 49 § 44.* No doubt can be entertained that he knew that he could not, if he faithfully performed his duty, make a report in favor of the defendant, unless the defendant proved, in the language of Mr. Justice Whelpley, in *Phœnix Iron Co.* v. *New York Wrought Iron Railroad Chair Co., 3 Dutch. 490,* that his demand was such an one as would support an action at law. He also undoubtedly knew that his functions as auditor were precisely like those of a jury, and that it was his duty to decide the question whether the demand made by the defendant was valid or not, according to law and the evidence. The qualifications of the auditor, the fact that the defendant's claim appeared to be invalid on its face and that a report was, nevertheless, made in its favor, when considered together, render it almost absolutely certain that the defendant must, in making his proofs before the auditor, have not only concealed, but also misrepresented, the facts tending to show that his claim was invalid. The fact that a report was made in favor of the defendant's claim makes it quite certain, as I think, that the defendant did not tell the auditor that the complainant disputed his claim, insisting that his right of action on it was barred by lapse of time, and that he meant to resist its enforcement. The evidence of invalidity, apparent on the face of the claim, leads me to believe that it would not have been possible for the defendant to have procured

6

a report to be made in favor of his claim if no misrepresentation of fact had been made to the auditor, but all the material facts touching the validity of his claim had been laid before him. The auditor, as a minister of justice, was in a position where he could not fail to see that it was his duty to act with great discretion and caution. The defendant was before him attempting to procure to be established against a non-resident, who was ignorant of what was being done, a stale claim for a large sum of money. This condition of affairs would naturally induce a just and sagacious man to be watchful, to act with the utmost care and to withhold his approval from any claim not clearly shown to be valid in law. I feel sure that the auditor in this case appreciated the delicate character of his duties and tried to perform them faithfully, but, from the facts now before the court, it is plain that he was induced to make a report in favor of the defendant's claim, either by the concealment or misrepresentation of material facts, possibly by both.

As the judgment against which relief is sought has been executed, it is manifest that the only effectual relief which can be given is a decree compelling the defendant to restore what he has wrongfully acquired by means of his judgment. Such a decree will be made.

The defendant must pay costs.